HONORABLE TIFFANY M. CARTWRIGHT

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT TACOMA

JUSTIN FRANKS,

               Plaintiff,

     v.

THE NIELSEN COMPANY (US), LLC;
GRACENOTE, INC.; JOHN DOES 1-10,

               Defendants.

No. 3:23-cv-06150

**SECOND AMENDED COMPLAINT**

**JURY DEMAND**

      NOW COMES THE PLAINTIFF, by and through his attorneys, and complains against Defendants as follows:

### JURISDICTION AND VENUE

      1.    This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a). Venue is proper in the Western District of Washington pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

### PARTIES

      2.    Defendant The Nielsen Company (US), LLC ("Nielsen") bills itself as a "global leader in audience measurement, data and analytics, shaping the future of media." It operates

**STOWELL & FRIEDMAN, LTD.**
303 West Madison Street, Suite 2600
Chicago, Illinois 60606
(312) 431-0888

around the world, including in the state of Washington, and employs tens of thousands of people.

3.      Defendant Gracenote, Inc. ("Gracenote") bills itself as "the world's leading entertainment data and technology company" and is one of the Nielsen Company's subsidiaries.

4.      Both Defendants are registered and do business in Washington State.

5.      Around the time that Plaintiff's employment was terminated, Nielsen engaged in several major changes to its corporate structure. Plaintiff believes that other Nielsen-related entities may have been involved in, or responsible for, various events described herein. Accordingly, Plaintiff sues these defendants by the fictitious names John Does 1 through 10. When the true names, involvement, and capacities of these unknown parties are ascertained, Plaintiff will seek leave to amend this Complaint accordingly.

6.      Justin Franks ("Plaintiff" or "Franks") is African American and an experienced and successful information technology leader with more than two decades of experience building and leading tech organizations, everywhere from large corporations like Amazon and Hewlett Packard to fast-growing start-ups. Franks has resided in this judicial district, since 2019. Prior to 2019, Franks resided in the state of California and continued to perform work for Nielsen in Washington and California thereafter.

## FACTUAL ALLEGATIONS

### *Nielsen's Predecessor Hires Franks, Who Successfully Builds Two Key Tech Departments*

7.      In 2015, Franks interviewed for a manager role at Gracenote (which later was purchased by, and became a division of, Nielsen). Franks was told that Gracenote was looking for a manager to lead a small (two to three employee) Development Operations (or "DevOps") team. Before he was offered the position, Gracenote subjected Franks to a gauntlet of an interview process: he interviewed with more than a dozen Gracenote employees. Franks subsequently learned that the interview process was unprecedented. Non-Black managers and

**STOWELL & FRIEDMAN, LTD.**
303 West Madison Street, Suite 2600
Chicago, Illinois 60606
(312) 431-0888

higher-level leaders hired around the same time never had to interview with more than a handful of people.

8.      After accepting the offer and joining Gracenote as a manager, Franks learned that Gracenote actually had much bigger plans for his role. Franks was asked to build two new key IT departments from scratch: DevOps and Cloud. Despite being expected to work at a much higher level than his manager title and compensation implied, Franks embraced the challenge enthusiastically. Applying his substantial skills, the lessons he learned from many years working at tech companies of all sizes, his ability to recruit and motivate talented employees, and his full energy and effort to the work, Franks successfully completed the herculean tasks Gracenote assigned to him. Franks not only hired and trained two brand new teams, but also developed all technologies, processes, cost-controls, reporting, monitoring, and support related to the teams. During his tenure, his departments' annual run-rate grew from $50,000/year to $80,000,000/year.

9.      By any measure, Franks succeeded in building out the DevOps and Cloud teams. Franks's exceptional performance—in building from scratch and successfully leading two brand-new IT departments, while being compensated at a mere manager level—should have positioned him on the fast track for promotion and career development.

***Despite Franks's Outstanding Performance, Nielsen Displaces Him in Favor of White Men, Assigns Him Menial Tasks, and Pushes Him Toward 'Diversity'-Focused Roles***

10.     In early 2017, Nielsen purchased Gracenote and took over the business, including the teams Franks built and lead.

11.     At around the time of the Nielsen-Gracenote merger, in recognition of his exceptional performance, Nielsen selected Franks to participate in the Nielsen Diverse Leadership Network. Only 40 Nielsen employees (approximately 1 in 1,000) were selected for this honor.

**STOWELL & FRIEDMAN, LTD.**
303 West Madison Street, Suite 2600
Chicago, Illinois 60606
(312) 431-0888

12.     The stated purpose of the Nielsen Diverse Leadership Network was to create a strong bench of diverse leaders that the business could "tap into" as emerging executives. But, as Franks subsequently learned, that promise was false—at least as it pertains to talented Black employees selected for the program. Franks would later learn that Black attrition in the program was 300% higher than all other groups. In reality, Nielsen used the program and others like it as diversity window dressing and to placate talented Black employees and give them the false impression that Nielsen values them and would consider moving them into positions of real responsibility.

13.     After the Nielsen-Gracenote merger was completed, Nielsen's IT leadership visited Franks and his teams at their Emeryville, California office, to discuss their work. Franks met with Nielsen Technology leaders Josh Langley, Gene Malloy, and others who reported to the Nielsen Chief Information Officer ("CIO"). The meeting went well, and Langley invited Franks back to Nielsen Tech headquarters in Florida to exchange best practices about Cloud and DevOps with other Nielsen Tech leaders.

14.     Despite his excellent work building and leading the Cloud and DevOps departments—excellent work that Nielsen Tech leaders openly acknowledged in writing and praised Franks for—Nielsen removed him from his role leading those teams and departments. The Chief Technology Officer ("CTO") at the time explained that Nielsen wanted to bring in Alex Linden Levy (white) and Jim Roth (white), to run the departments Franks built. After being removed from his leadership role, Franks was to report to and assist the CTO with unspecified "special projects."

15.     Nielsen wanted to bring Linden Levy in at a Senior Director level, two levels above Franks's manager title. Nielsen recognized the optics of importing a white man to

Second Amended Complaint
No. 3:23-cv-06150
Page 4

**STOWELL & FRIEDMAN, LTD.**
303 West Madison Street, Suite 2600
Chicago, Illinois 60606
(312) 431-0888

replace a high-performing Black employee, while assigning him a title and compensation two levels higher. Accordingly, the CTO and a Director in Nielsen's human resources ("HR") department, called Franks into a meeting and announced that his title would be "corrected" to Director. The CTO acknowledged that Franks's scope of work and responsibilities building and leading the Cloud and DevOps departments were at least at a "Director" level. Nielsen did not, however, make the title "correction" retroactive or compensate Franks in any manner for performing work above and beyond his title for the prior two years.

16.     Nielsen sold Franks on the new role as a reward for his strong performance, and as a recognition of his strong future potential in the organization. However, he would later learn that the new job was actually a humiliating demotion. Franks had been running two departments, with seven direct reports and about 10 dotted-line reports, making decisions for two business departments with a run-rate in the high eight-figures. In his new role, Franks was marginalized and relegated to low-level tasks that required little to none of his management experience or technical expertise.

17.     For instance, CTO Kay Johansson and his direct reports assigned Franks tasks like increasing the variety of snacks available in the office, setting up conference rooms, and facilitating a paint job for an executive's office. When Franks began reporting to California-based Senior Vice President of TechOps Tricia Higgins, the menial assignments continued. While reporting to her and throughout 2022, Higgins assigned Franks a host of low-level tasks including, but not limited to, creating a flow chart for the basic steps in the talent-recruiting process, creating a spreadsheet listing contracts and vendors, creating a Wiki page for listing products, documenting customer-facing external URLs, and working with data entry people to add employee information to human resources software.

Second Amended Complaint
No. 3:23-cv-06150
Page 5

**STOWELL & FRIEDMAN, LTD.**
303 West Madison Street, Suite 2600
Chicago, Illinois 60606
(312) 431-0888

18.     Nielsen appointed Franks to serve as the head of its employee resource group for Black employees in North America, known as "SABLE."

19.     As Franks subsequently learned, Nielsen has a practice of "rewarding" Black employees with meaningless "diversity" awards and programs, shunting them into "diversity" related roles, and refusing to fairly pay and promote talented and high-performing Black employees, to avoid having Black employees in positions of real responsibility relating to Nielsen's core business and operations. These practices are especially prevalent in Nielsen's technology organization under its CTO since 2017, Srini Varadarajan.

20.     In contrast, Nielsen's standard practice with respect to favored non-Black employees is to simply place them in roles of increasing responsibility and higher pay, without any objective criteria, performance metrics, or competitive processes. These non-Black employees are tapped on the shoulder and handed new opportunities that facilitate their career development and increased earning potential. Then, frequently, these favored non-Black employees are promoted, again without reference to any objective criteria, performance metrics, or competitive processes. For example, Nielsen placed Linden Levy and Roth into what had been Franks's role atop the Cloud and DevOps organization and then quickly promoted them to Vice President (three levels above where Franks had been hired). Nielsen similarly employs discriminatory pay practices that result in higher earnings for non-Black employees.

21.     Having been removed from his position of real responsibility and growth potential, for reasons Nielsen acknowledged were unrelated to his outstanding work performance, and forced by Nielsen into a glorified project management role, Franks's career stagnated.

**STOWELL & FRIEDMAN, LTD.**
303 West Madison Street, Suite 2600
Chicago, Illinois 60606
(312) 431-0888

22.     Franks completed the Nielsen Diverse Leadership Program and discussed his interests and career goals with Nielsen's senior leaders. He received glowing 360 reviews from other employees in the organization. Nonetheless, Nielsen did not provide Franks any meaningful responsibilities or growth opportunities. Instead, Nielsen moved Franks further down in the organization, removing him from reporting to Gracenote's CTO and having him report to a (white) Vice President.

23.     As the years progressed, Franks watched as Nielsen gave Jennifer Dixon, Renek Wojtkowski, Derek Murrans, Scott Haste, Peter Dunker, Richard Carlson—white employees, some of whom Franks trained in Cloud and DevOps—promotions, increased responsibility, and lucrative compensation.

***Franks Uncovers and Brings to Leadership's Attention Nielsen's Racially Discriminatory Practices***

24.     Despite the shock and frustration of having the bulk of his responsibilities taken away from him, and being assigned humiliating intern-level tasks, Franks continued to perform at a high level. He threw himself into the projects he worked on, pouring his full energy and talent into the projects Nielsen assigned him.

25.     Among other things, Nielsen—in accordance with its standard, race-based practice of assigning Black employees to work on "diversity" issues rather than Nielsen's core business operations—assigned Franks various tasks relating to diversity and HR. In addition, as leader of the SABLE group, Franks began learning that his experiences—of being brought into Nielsen at lower levels than non-Black employees with similar experience, passed over or unseated in favor of non-Black employees, denied recognition for his accomplishments, denied compensation and paid less than non-Black colleagues, and refused positions and opportunities in line with his achievements and abilities—were common for Black employees in the

Second Amended Complaint
No. 3:23-cv-06150
Page 7

**STOWELL & FRIEDMAN, LTD.**
303 West Madison Street, Suite 2600
Chicago, Illinois 60606
(312) 431-0888

organization. He dedicated himself to getting to the bottom of these issues, and to offering actionable solutions for Nielsen's leadership.

26.     In July 2022, Nielsen promoted Peter Dunker to Vice President of Cloud/CloudOps at Gracenote. Franks had trained Dunker, who came into the role with zero large scale cloud experience, and therefore was obviously more qualified for the Vice President position. Despite Franks' repeated interests in advancement, Nielsen did not afford Franks even the opportunity to compete for the role. As is Nielsen's standard practice for its favored non-Black employees, Nielsen simply gave Dunker the role without opening a job requisition.

27.     Shortly thereafter, during a three-day in-person conference at Nielsen's Emeryville, California, office, Franks approached Nielsen's Chief Diversity Officer Sandra Sims-Williams. He described his career path—or lack thereof—at Nielsen. He explained how, despite his years of accolades and purported "leadership development" at Nielsen, and receiving nothing but awards and praise, Nielsen refused to promote him or place him in a role with real responsibility (which he once had, and succeeded in, before Nielsen bought Gracenote and removed him in favor of white employees). Franks expressed that if it is this hard for someone like him, who was treated like a "golden child" in terms of accolades and recognition, to advance in the organization, then it must be impossible for other Black employees. Sims-Williams asked him to create a list of other non-white Nielsen employees who were in a similar position, who were denied advancement despite their talent and success at the company. Franks did as requested, providing Sims-Williams a list that included a dozen other Black employees that he knew of.

28.     During the Emeryville, California, conference, Franks also spoke with Sujit Das Munshi, a member of Nielsen's executive team, Gracenote's general manager, and a former people leader. Franks confided his frustration with the lack of opportunity for Black employees at Nielsen and related the story of a Black Nielsen employee who had worked there for 19 years and developed two patents, but had never been promoted.

STOWELL & FRIEDMAN, LTD.
303 West Madison Street, Suite 2600
Chicago, Illinois 60606
(312) 431-0888

29.     In August 2022, Franks attended a follow-up video meeting with Das Munshi. At the meeting, Franks discussed the difficulties talented Black employees at Nielsen faced in trying to advance in the organization. He asked Das Munshi if Nielsen considers data in talent reviews. Das Munshi explained that Nielsen did not use much data, but instead mostly relied on anecdotes from people managers and leaders to determine which employees are selected for advancement.

30.     Also in August 2022, Franks presented one of the projects he was working on— a people analytics dashboard—to several key leaders in tech, diversity, and HR. While the leaders were highly critical of the idea, Franks later learned that non-Black HR leaders took the idea and began implementing it, without crediting or involving Franks.

31.     In September 2022, Franks was one of only 30 individuals chosen to participate in another selective purported "career development" program for Black Nielsen employees, called "Prepare to Launch," which was billed as a program to give "high-performing" Black employees in the U.S. "a unique opportunity for visibility, professional development and career support."

32.     In reality, "Prepare to Launch" was yet another useless program designed to placate Nielsen's Black employees by instilling in them false hope that Nielsen's leaders would ever allow its Black employees to ascend to high-ranking positions relating to the company's core businesses.

33.     In November 2022, Franks asked Nielsen's Chief Talent Officer Adam Levy whether Nielsen keeps track of which "diverse" employees have completed the various career development programs Nielsen offered. Levy responded that Nielsen did not. In other words, Nielsen leaders had no way of knowing which "diverse" employees the company had identified as standouts, invested in, and who had received the "career development" resources that Nielsen kept promising would lead to greater opportunities. Franks was stunned that Nielsen and Levy did not capture basic people data around employees who were identified as top talent

**STOWELL & FRIEDMAN, LTD.**
303 West Madison Street, Suite 2600
Chicago, Illinois 60606
(312) 431-0888

and selected for "diversity" leadership programs purportedly designed to bring equal opportunity, and that this information was therefore not considered in succession planning, talent reviews, and other opportunities.

34.     Later that month, Franks spoke with Nielsen Media CEO Karthik Rao. As he had with Sims-Williams, he described his lack of career progression at Nielsen, despite his outstanding performance and repeated selection for highly selective programs aimed at "diverse" Nielsen employees. Franks shared what he learned from Levy—that Nielsen did not even track or identify which Black employees had been selected for or completed those programs. Franks explained that, despite the years of purported leadership development at Nielsen, he was still "sitting on the bench." He asked to be "put on the field" and offered a role befitting his talent, experience, and Nielsen's investment in him. Rao simply responded, "we hear you" but made no assurances and took no action.

35.     In December 2022, at the suggestion of the Chief Diversity Officer Sandra Sims-Williams, Franks sent an email with the subject line "Correcting Mistreatment and Injustice" to Nielsen CEO David Kenny, CTO Srini Varadarajan, Sims-Williams, Dunker, and his supervisor, Gracenote CTO Chief of Staff Darbara Szalay. The email addressed Franks's experience at Nielsen: his successful work building new IT teams at Gracenote, how his position was taken away from him, all the accolades and professional development opportunities he had received, which never resulted in any tangible benefits or another role with real responsibility. Franks explained: "This is not an isolated incident. Stories like this have happened to a number of Black associates in our Tech Org which is why there are NO Black leaders in our tech org."

36.     Around this time, Franks dug into the issue of Black representation in Nielsen's tech organization. The results were shocking. No matter how the data was sliced, Nielsen lagged far behind the industry and its competitors in Black representation. According to the

Second Amended Complaint
No. 3:23-cv-06150
Page 10

**STOWELL & FRIEDMAN, LTD.**
303 West Madison Street, Suite 2600
Chicago, Illinois 60606
(312) 431-0888

2022 US Bureau Of Labor Statistics, the industry average for Black people working in technology is between 5.5% and 10.5%. But in Nielsen's CTO organization:

    a.   There were no Black senior leaders;

    b.   None of the CTO's 14 direct reports were Black;

    c.   Franks was only one of two Black employees, of 123, who reported to employees who reported to the CTO.

    d.   Of the next level down in the tech organization, only 5 of 681 were Black (0.7%);

    e.   Of the top four layers of the tech organization only 13 of nearly 2,000 employees were Black (0.7%);

    f.   While Black employees were disproportionately employed in the bottom levels of the tech organization, in total, less than 1% of the employees in Nielsen's tech organization were Black, 800% to 1500% lower than industry average.

    37.    In early January 2023, Nielsen CEO Kenny called Franks for a one-on-one meeting. Franks described his career path at Nielsen, the many accolades and selective "career development" opportunities for "diverse" employees he received, and his experience watching white employees like Dunker, whom Franks trained in Cloud and DevOps, ascend above him in the organization, while he remained sidelined. After listening to Franks's story, Kenny asked Franks why he "stuck around." Franks answered that it was because he was so honored and distracted by being given awards, selected for the Diverse Leadership Network program, asked to lead the SABLE ERG, and receiving executive coaching and other accolades. He explained that he had genuinely believed that Nielsen viewed him as a special talent and that it was interested in his career development.

    38.    Kenny explained that Nielsen's historic goal relating to diversity had been just to get good ratings from Diversity Inc. and other similar public rankings. But he claimed that he now discussed data relating to diversity during regular check-ins with Sims-Williams. He

Second Amended Complaint
No. 3:23-cv-06150
Page 11

**STOWELL & FRIEDMAN, LTD.**
303 West Madison Street, Suite 2600
Chicago, Illinois 60606
(312) 431-0888

acknowledged Nielsen could "be better" on these issues. He suggested that Franks discuss his concerns with HR. Kenny also suggested that Franks consider looking for jobs elsewhere.

***Nielsen Labels Franks "Disruptive" Because of His Efforts to Ameliorate Nielsen's Discriminatory Practices and Fires Him Weeks After a Planned RIF Concluded in the U.S. Due to his Race and Protected Activity***

39.     Along with other people managers, Franks attended a meeting on January 10, 2023, to discuss an upcoming reduction in force ("RIF"). The meeting's leaders described the script that leaders would use to deliver the news to affected employees. They explained that Nielsen's leadership had made decisions about whose jobs would be cut and that people managers like Franks would have no input. They described and displayed a PowerPoint presentation with the timeline for the forthcoming job cuts, stating that layoffs in the U.S. would start in mid-January and end by mid-February.

40.     After the meeting, Franks emailed Adam Levy and HR Senior Vice President Tracy Staines to get clarification on the criteria that were used for the layoff decisions. Staines responded that decisions were made based on several factors, including tenure, performance, need for work, elimination of work, etc.

41.     That same day, Franks met with a Senior Vice President of DE&I at Nielsen, who informed Franks that Adam Levy and HR avoid using people data because they don't want to be held accountable. She explained that she had to constantly insert herself into talent reviews and HR discussions to advocate for Black employees and that doing so upsets HR. She went on to tell Franks that she told the business she would leave the company if Adam Levy kept pushing back on efforts to make employment opportunities truly equal. She also informed Franks that Nielsen's HR leadership viewed him as disruptive and wanted him "out" because of his efforts to hold them accountable.

Second Amended Complaint
No. 3:23-cv-06150
Page 12

**STOWELL & FRIEDMAN, LTD.**
303 West Madison Street, Suite 2600
Chicago, Illinois 60606
(312) 431-0888

42.     Also in January 2023, Franks met with Das Munshi to explore potential opportunities at Gracenote. Das Munshi was non-committal and said that he would let Franks know if any relevant openings at Gracenote became available, so Franks could "apply" for a position. Das Munshi's response contrasted with Nielsen's standard practices toward non-Black employees like Dunker, Roth, Linden Levy, Senior Vice President Jennifer Dixon, and many others who were given opportunities for career and compensation growth, without having to "apply" or participate in a competitive process.

43.     At the time of the RIF, Franks had two direct reports, both of whom had the exact same job title and salary. His Black direct report had much more professional work experience overall (20 years vs. 4 years), more experience at Nielsen (7 years vs. 4 years), and did more work, at a higher level, than the white direct report. The white direct report had little to do, and Franks had been actively looking for projects for her. Nonetheless, Nielsen's leadership decided to lay off the more experienced, longer-tenured, more productive Black employee who was doing critical work for the Nielsen global network leader and keep her white counterpart. Franks was forced to implement leadership's decision on January 11, 2023. When the white employee learned that the Black employee had been laid off instead of her, she acknowledged that she "should have been the one to go."

44.     Apart from Franks, only seven other Black Nielsen/Gracenote employees worked in the Gracenote division before the RIF. Nielsen used the RIF to target Black employees and those who spoke out against racial bias, firing more than half (four of seven or 57%) of the Black professionals in the RIF. Nielsen also positioned non-Black employees more favorably before (and after) the RIF in order to save their jobs, while positioning Black employees for failure and termination.

45.     As a result of Nielsen's discriminatory practices, the RIF disparately impacted Black employees, who—despite their minuscule representation at the company—were more likely than non-Black employees to lose their jobs in the RIF.

Second Amended Complaint
No. 3:23-cv-06150
Page 13

STOWELL & FRIEDMAN, LTD.
303 West Madison Street, Suite 2600
Chicago, Illinois 60606
(312) 431-0888

46.     In contrast to non-Black counterparts who were rewarded with expanded roles as a result of the RIF, Nielsen moved Franks's one remaining direct report to another manager, illustrating starkly how Nielsen had decimated his career—for reasons having nothing to do with his work performance, which Nielsen had always told him was outstanding. When Nielsen bought out Gracenote, Franks had seven direct reports and another ten or so employees with a dotted line relationship up to him. After the January 2023 RIF, he had zero direct reports.

47.     In the weeks following the RIF, Franks continued to seek new responsibilities and opportunities. He identified several non-Black individuals who had been given new, expanded roles in the wake of the RIF and related reorganization, and asked Nielsen leaders why those kinds of opportunities never came about for him or other Black employees. Franks continued to get the run around from Nielsen's leadership, which insultingly attempted to steer him toward entry-level positions, like recruiter, which had no connection to his two-plus decades of tech and people management experience. Humiliatingly, Franks was told to speak with Dunker—whom Franks had trained on Cloud and DevOps and who had ascended to a Vice President position without any competitive process—to seek out a role under him.

48.     In late February 2023, Nielsen told Franks he would be "moving under" and reporting to a white Program Manager. The white Program Manager described the work she planned to assign him, which was nearly identical to what Franks's laid-off Black direct report had done. Franks raised concerns about the effective demotion to Sims-Williams, writing that it "just feels like the same old story happening. Black person, super qualified, being given work and title far below experience, background, accomplishments, etc."

49.     A few weeks later, on March 16, 2023, Franks received a call from a colleague who informed him that key leaders at Nielsen "really wanted him out" because he was "making waves."

STOWELL & FRIEDMAN, LTD.
303 West Madison Street, Suite 2600
Chicago, Illinois 60606
(312) 431-0888

50.     On March 21, 2023—the day before the next scheduled "Prepare to Launch" meeting, where Franks would have the opportunity to discuss recent events with Black colleagues—Franks was called into a meeting with Adam Levy and Sims-Williams, the Chief Diversity Officer. Sims-Williams said that his position was eliminated effective immediately due to "global economic conditions" and read the script that was associated with the RIF. In reality, though, the RIF in North America had concluded weeks before Nielsen terminated Franks's employment.

51.     After his termination, Franks reached out directly to Kenny to see if he would be willing to help Franks with his job search. Franks wrote: "Can you connect me with a couple of people you know outside Nielsen that you feel I'd work well with? My intersection is People/Tech/Operations." After a few emails back and forth, Kenny responded with the names of three people he knew at other companies whom he felt Franks would "work well with." All three were Black.

***Franks Suffered Damages***

52.     As a direct and proximate result of Nielsen's conduct, Franks has suffered wage and financial losses and irreparable damage to his career.

53.     As a direct and proximate result of Nielsen's conduct, Franks has suffered severe emotional and mental distress, loss of reputation, embarrassment and humiliation, loss of enjoyment of life, inconvenience, and other non-pecuniary losses.

54.     By the acts and conduct described above, Nielsen intended to cause Franks severe emotional distress, or acted in reckless disregard of the injury that its actions had caused and would cause to Franks.

<u>**COUNT I**</u>

**RACIAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981**

55.     Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

**STOWELL & FRIEDMAN, LTD.**
303 West Madison Street, Suite 2600
Chicago, Illinois 60606
(312) 431-0888

56.     Section 1977 of the Revised Statutes, 42 U.S.C. § 1981, as amended, guarantees persons of all races the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship, including employment relationships.

57.     By the acts and conduct described above, Defendants engaged in illegal intentional racial discrimination against Plaintiff in violation of 42 U.S.C. § 1981.

58.     Plaintiff has been harmed as a direct and proximate result of Defendants' unlawful conduct.

59.     Punitive damages are appropriate because Defendants' conduct was malicious and/or Defendants were recklessly indifferent to Franks's protected rights.

<u>**COUNT II**</u>

**RETALIATION IN VIOLATION OF 42 U.S.C. § 1981**

60.     Plaintiff realleges Paragraphs 1 through 54 and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

61.     Section 1981 makes it unlawful for an employer to retaliate against an employee because that employee engaged in protected activity, such as challenging, reporting, and complaining to his employer about race discrimination.

62.     Plaintiff engaged in protected activity by challenging, reporting, and complaining about race discrimination to Defendants.

63.     Defendants took adverse employment actions against Plaintiff as further discrimination and in retaliation for engaging in this protected activity.

64.     Plaintiff was subjected to and harmed by Defendants' further discrimination and retaliation after he complained about Defendants' racially discriminatory conduct.

65.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages.

**STOWELL & FRIEDMAN, LTD.**
303 West Madison Street, Suite 2600
Chicago, Illinois 60606
(312) 431-0888

66.     Punitive damages are appropriate because Defendants' conduct was malicious and/or Defendants were recklessly indifferent to Franks's protected rights.

## COUNT III

## RACE DISCRIMINATION IN VIOLATION OF TITLE VII

67.     Plaintiff realleges Paragraphs 1 through 54 and incorporates them by reference as though fully stated herein as part of Count III of this Complaint.

68.     Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended, makes it unlawful for an employer to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of race, or to limit, segregate, or classify its employees or applicants for employment in any way which deprives or tends to deprive any individual of employment opportunities or otherwise adversely affects his or her status as an employee on the basis of race.

69.     Plaintiff filed a Charge of Discrimination with the EEOC and has exhausted his administrative remedies.

70.     By their conduct as alleged herein, Defendants unlawfully discriminated against Plaintiff, under both disparate treatment and disparate impact theories of liability.

71.     As a direct and proximate result of Defendants' willful and wanton conduct, Plaintiff is entitled to all legal and equitable remedies available.

## COUNT IV

## RETALIATION IN VIOLATION OF TITLE VII

72.     Plaintiff realleges Paragraphs 1 through 54 above and incorporates them by reference as though fully stated herein as part of Count IV of this Complaint.

**STOWELL & FRIEDMAN, LTD.**
303 West Madison Street, Suite 2600
Chicago, Illinois 60606
(312) 431-0888

73.     Title VII makes it unlawful for an employer to retaliate against an employee because that employee engaged in protected activity, such as complaining to his employer about discrimination on the job.

74.     Plaintiff filed a Charge of Discrimination with the EEOC and has exhausted his administrative remedies.

75.     Plaintiff engaged in protected activity by challenging, complaining, opposing, and reporting unlawful discriminatory conduct to Defendants.

76.     Defendants subjected Plaintiff to additional discrimination and retaliation because he engaged in protected activity.

77.     Plaintiff has been harmed as a direct and proximate result of Defendants' unlawful conduct.

## COUNT V

## RACE DISCRIMINATION IN VIOLATION OF THE WASHINGTON LAW AGAINST DISCRIMINATION ("WLAD")

78.     Plaintiff realleges Paragraphs 1 through 54 and incorporates them by reference as though fully stated herein as part of Count V of this Complaint.

79.     Defendants were "Employers" under the WLAD, as each has more than eight employees. RCW 40.60.040(11).

80.     The WLAD prohibits employers from, among other things, refusing to hire, discharging, or discriminating against persons based on their race. RCW 40.60.180.

81.     By the acts and conduct described above, Defendants engaged in race discrimination against Plaintiff, in violation of the WLAD.

82.     As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has incurred and will continue to incur damages in an amount to be proven at trial.

**STOWELL & FRIEDMAN, LTD.**
303 West Madison Street, Suite 2600
Chicago, Illinois 60606
(312) 431-0888

83.     Plaintiff challenges Defendants' discriminatory conduct under both disparate treatment and disparate impact theories of liability.

## COUNT VI

### RETALIATION IN VIOLATION OF THE WASHINGTON LAW AGAINST DISCRIMINATION ("WLAD")

84.     Plaintiff realleges Paragraphs 1 through 54 and incorporates them by reference as though fully stated herein as part of Count VI of this Complaint.

85.     Defendants were "Employers" under the WLAD, as each has more than eight employees. RCW 40.60.040(11).

86.     The WLAD prohibits employers from retaliating against employees for opposing practices made illegal by the WLAD. RCW 40.60.210(1).

87.     Plaintiff engaged in protected activity by opposing Defendants' discriminatory practices.

88.     By the acts and conduct described above, Defendants retaliated against Plaintiff, in violation of the WLAD.

89.     As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has incurred and will continue to incur damages in an amount to be proven at trial.

90.     Plaintiff challenges Defendants' discriminatory conduct under both disparate treatment and disparate impact theories of liability.

## COUNT VII

### RACE DISCRIMINATION IN VIOLATION OF THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT ("FEHA")

91.     Plaintiff realleges Paragraphs 1 through 54 and incorporates them by reference as though fully stated herein as part of Count VII of this Complaint.

92.     In 2019, Plaintiff moved from California to Washington. However, throughout his employment with Defendants, Plaintiff's official work location remained Gracenote's

Second Amended Complaint
No. 3:23-cv-06150
Page 19

**STOWELL & FRIEDMAN, LTD.**
303 West Madison Street, Suite 2600
Chicago, Illinois 60606
(312) 431-0888

headquarters in Emeryville, California. He physically traveled to the Emeryville Office to do business on a regular basis, before the COVID-19 pandemic made travel infeasible. Franks worked virtually with Defendants' employees in California almost daily. Tricia Higgins, Franks's manager until May 2022, was located in California and engaged in conduct that adversely affected Plaintiff there. And in July 2022, Franks traveled to an in-person conference in California where he engaged in protected activity.

93.     California Government Code Section 12940(a) makes it an unlawful employment practice for an employer to discharge or otherwise discriminate against a person "in compensation or in terms, conditions, or privileges of employment" "because of [] race."

94.     As set forth above, Defendants discharged and discriminated against Plaintiff based on his race.

95.     Plaintiff challenges Defendants' discriminatory conduct under both disparate treatment and disparate impact theories of liability.

96.     As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has incurred and will continue to incur damages in an amount to be proven at trial.

97.     The actions alleged herein were done with malice, fraud, and oppression, and in reckless disregard of Plaintiff's rights. Plaintiff is thus entitled to recover punitive damages from Defendants.

98.     On November 22, 2023, Plaintiff filed a complaint of discrimination with the California Department of Fair Employment & Housing ("DFEH") regarding the matters encompassed by this Complaint. The DFEH issued Plaintiff a right-to-sue notice dated November 30, 2023.

## COUNT VIII

## RETALIATION IN VIOLATION OF FEHA

99.     Plaintiff realleges Paragraphs 1 through 54 and incorporates them by reference as though fully stated herein as part of Count VIII of this Complaint.

STOWELL & FRIEDMAN, LTD.
303 West Madison Street, Suite 2600
Chicago, Illinois 60606
(312) 431-0888

100.    In 2019, Plaintiff moved from California to Washington. However, throughout his employment with Defendants, Plaintiff's official work location remained Gracenote's headquarters in Emeryville, California. He physically traveled to the Emeryville Office to do business on a regular basis, before the COVID-19 pandemic made travel infeasible. Franks worked virtually with Defendants' employees in California almost daily. Tricia Higgins, Franks's manager until May 2022, was located in California and engaged in conduct that adversely affected Plaintiff there. And in July 2022, Franks traveled to an in-person conference in California where he engaged in protected activity.

101.    California Government Code Section 12940(h) makes it an unlawful employment practice for an employer to "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices" made unlawful by FEHA.

102.    Plaintiff engaged in protected activity by opposing Defendants' discriminatory practices.

103.    By the acts and conduct described above, Defendants retaliated against Plaintiff, in violation of FEHA.

104.    As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has incurred and will continue to incur damages in an amount to be proven at trial.

105.    The actions alleged herein were done with malice, fraud, and oppression, and in reckless disregard of Plaintiff's rights. Plaintiff is thus entitled to recover punitive damages from Defendants.

106.    On November 22, 2023, Plaintiff filed a complaint of discrimination with the California Department of Fair Employment & Housing ("DFEH") regarding the matters encompassed by this Complaint. The DFEH issued Plaintiff a right-to-sue notice dated November 30, 2023.

**STOWELL & FRIEDMAN, LTD.**
303 West Madison Street, Suite 2600
Chicago, Illinois 60606
(312) 431-0888

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court find in his favor and against Defendants as follows:

a. Declare that the acts and conduct of Defendants are unlawful and violate 42 U.S.C. § 1981, Title VII, the Washington Law Against Discrimination, and the California Fair Employment and Housing Act;

b. Award Plaintiff the value of all compensation and benefits lost as a result of Defendants' unlawful conduct;

c. Award Plaintiff the value of all compensation and benefits he will lose in the future as a result of Defendants' unlawful conduct;

d. Award Plaintiff compensatory damages, including but not limited to damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

e. Award Plaintiff punitive damages due to Defendants' malicious conduct and/or Defendants' reckless or callous indifference to the statutorily protected rights of Plaintiff;

f. Reinstate Plaintiff with retroactive seniority, benefits, and adjusted compensation;

g. Award Plaintiff prejudgment interest;

h. Award Plaintiff attorneys' fees, costs, and disbursements pursuant to 42 U.S.C. § 1988; and

i. Award Plaintiff such other make whole equitable, injunctive, and legal relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues of fact and damages triable in this action.

**STOWELL & FRIEDMAN, LTD.**
303 West Madison Street, Suite 2600
Chicago, Illinois 60606
(312) 431-0888

Respectfully submitted this 2nd day of April, 2024:

STOWELL & FRIEDMAN, LTD.          SHISHIDO TAREN GOLDSWORTHY

By: */s/ Linda D. Friedman*            By: */s/ Jordan A. Taren*
Linda D. Friedman, Bar No. 6190092 (IL)     Jordan A. Taren, WSBA No. 50066
Stowell & Friedman, LTD.             Shishido Taren Goldsworthy PLLC
303 W. Madison St., Suite 2600         705 Second Avenue, Suite 1500
Chicago, IL 60606                Seattle, WA 98104
Telephone: (312) 431-0888           Telephone: (206) 622-1604
Fax: (312) 431-0228               Email: jtaren@shishidotaren.com
Email: lfriedman@sfltd.com